HEARD NOV. TERM, 1871.

HINTON vs. KENNEDY.

On an appeal from the concurring judgment of the Commissioner and Chancellor upon a question of fact, the *onus* is on the appellant to show, from the facts in evidence, that there is no reasonable doubt of the error alleged.

Where the estate of a decedent becomes insolvent after his death, the general assets cannot be longer applied to the maintenance of the family.

Where the administrator of an entirely solvent estate pays simple contract creditors out of their order, reserving ample funds for the payment of specialty creditors, equity will relieve him from the legal consequences of the technical *devastavit,* if his conduct in making the payments was prudent and judicious; nor will he be charged because of the loss of the reserved assets, if no blame on account of such loss can be imputed to him.

Where a sealed note of decedent was due, not full twenty years before it is paid by his administrator, the presumption being that it represents a valid and subsisting debt of decedent, fraud, or collusion with the creditor, must be shown or the payment will be sustained.

Investment, in 1863, by an administrator, of $4,000 in Confederate securities, sustained.

The Supreme Court cannot hear an appeal from a *pro forma* decree of the Circuit Court.

BEFORE CARROLL, CH., AT CHESTER, JULY, 1867.

Bill in Equity by L. C. Hinton, administrator, with the will annexed, of Richard E. Kennedy, deceased, plaintiff, against Sarah Kennedy and others, devisees, legatees and creditors of testator, defendants.

The object of the bill was to wind up the estate of testator alleged to have been made insolvent by the emancipation in 1865 of the slaves belonging to the estate.

The accounts of the plaintiff as administrator were referred to the Commissioner of the Court, who made his report thereon as follows:

On the 9th day of June, 1855, Richard E. Kennedy executed his last will and testament, and appointed James Hemphill, executor

thereof. On the first day of November thereafter, he departed this life, and on the 7th of the same month the will was admitted to probate in common form. James Hemphill renounced the executorship, and the complainant was appointed administrator with the will annexed.

The will provides for the payment of all just debts. (Item 1st.)

First. By application to that purpose of all moneys collected from choses in action due the testator. (Item 2nd.)

Second. By sales of property. (2nd Item.)

It contains several devises and bequests, both specific and general. The specific devises and bequests are:

First, to the widow, Sarah Kennedy, for the support of herself and testator's children until the youngest child was twenty-one years of age, the dwelling house and lot in the Town of Chester; two plantations known as the Robinson and Lee places; all household and kitchen furniture; all the cattle, hogs, &c., on the said three places; one year's provisions of all kinds; a carriage and a pair of carriage horses to be bought; the necessary mules, wagons and agricultural implements for the two places; such house servants as she may need. (3rd Item.)

Second. To his wife, Sarah Kennedy, sufficient money to complete necessary repairs of dwelling, and to make and repair others that may be needed. (13th Item.)

Third. To his brother, John Kennedy, Jr., the buggy and horse in the State of Mississippi. (4th Item.)

The general devises are: First, all negroes (5th Item) and all bank stock (6th Item) to be equally divided between the widow and six children.

Second. All the rest and residue of the estate to be sold at the discretion of the executor and proceeds to be equally divided between wife and six children. The property mentioned in 3rd Item to be sold when the youngest child arrives at twenty-one years of age. (7th Item.)

It contains a number of directions to the executor as follows:

1st. A discretionary power to sell bank stock. (6th Item.)

2nd. A discretionary power to retain the legacy of the son Allen D. after he arrives at twenty-five years of age. (10th Item.)

3rd. A discretionary power to complete carriage shop. (11th.)

4th. To sell turbulent slaves. (11th Item.)

5th. To keep small negroes on the plantations mentioned in 3rd Item. (12th Item.)

6th. The wife authorized to select horses to work the Robinson & Lee places. (12th Item.)

7th. Executor may hire out all the negroes. (12th Item.)

8th. Directs the opening of a street. (14th Item.)

The testator at the time of his death was seized and possessed of a large estate, both real and personal, consisting of four tracts of land; the dwelling house and lot, and the carriage shop and lot in the town of Chester; about 135 slaves; 500 shares in the capital stock of the Bank of Chester; over $50,000 owing in choses in action; mules, horses, cattle, hogs, crop, agricultural implements, household and kitchen furniture.

He was very much involved in debt, and from the language of the 2nd clause of the will, he supposes that the money owing him on notes and accounts would be insufficient to pay his debts.

The testator left him surviving as the principal beneficiaries under his will, his widow Sarah Kennedy and six children, Allen D., Catherine, Sarah, Eliza Jane, Margaret Mary, and Pauline. His widow afterwards intermarried with David Pinchback, by whom she had one child named David Howard. David Pinchback died in 1858. In 1860 the widow again married Charles E. Simms and died the same year. David Howard Pinchback, the only issue of the second marriage, died in 1865. Allen D. Kennedy, the son, married soon after his father's death; was killed in battle during the war, and left a widow and two children.

The eldest daughter intermarried, in 1860, with E. T. Atkinson, and in 1864 departed this life, leaving her husband and two minor children surviving.

Of the testator's family there are now living, therefore, four daughters, all unmarried, two grandchildren, issue of his son Allen D. Kennedy, and two other grandchildren, the issue of his daughter Catherine Atkinson.

The complainant, as administrator with the will annexed, took charge of the estate in November, 1855; assented to the specific devises and bequests of property on hand; bought the carriage horses; furnished money to pay for repairs on the dwelling and kitchens; collected a large sum from choses in action; sold two tracts of land, the lot with the carriage shop, the bank stock, five or six negroes, and some other personalty; paid debts of testator, regardless of their rank; hired out most of the slaves, and contributed to the support of the family from the income of the portion of the estate remaining in his hands.

There are several large debts of testator, all of the grade of bonds and sealed notes, still unpaid. One claim for more than $12,000 is proper debt of the testator, and six others, to which he was security and is now bound to pay, amounting in the aggregate to $127,370.67; in 1865 the slaves were emancipated and the balance of the real estate on hand depreciated thereby, so that the assets are insufficient to pay these large debts.

The complainant has filed this bill asking for leave to account for his administration of the estate of his testator. That the creditors shall be called in; that the real estate be sold; and the balance of the estate be distributed among the creditors by this Court.

At the last session of the Court the following orders were passed, to wit:

"Ordered, That the complainants do account before the Commissioner of this Court for the administration of the estate of his testator, Richard E. Kennedy, and that the Commissioner do report on said accounting to the next term of this Court. Ordered, further, That the creditors of said testator be required to present and establish their respective demands before the Commissioner on or before the first day of May next. And that notice thereof be given them, by publication in the *Chester Standard*, at such intervals as the Commissioner may think proper."

The publication for the creditors of said testator was made in the *Chester Standard*, for 3 months in 1866, and for one month in 1867, and the claims presented and established are all of the rank of sealed notes and bonds amounting in the aggregate of principal and interest, on 1st of July, 1867, to one hundred and twenty-seven thousand three hundred and seventy dollars and sixty-seven cents.

The complainant has also accounted for his administration of the estate of his testator. The accounts are hereunto annexed, and show a balance against the complainant on the 1st day of July, 1867, of twelve thousand five hundred and one dollars and twenty-three cents.

The accounts up to 1st of January, 1863, have been made up in the usual way, by striking a balance at the end of each year, and carrying it forward to the debtor or creditor side of the account of the succeeding year. On the 1st of January, 1863, the balance against the complainant was $14,370.82. During the year 1863 he paid out $2,857.23 more than he received, and of the moneys paid $4,331.22 was of debts of testator. It is proper, therefore, that he should have the benefit or credit for this sum, of $2,857.23,

as of the 1st of January, 1863, as will be seen at the end of Exhibit "A" in what is *there called " the concluding statement."*

It appears that the complainant, in his account with the Ordinary, has charged himself each year with the aggregate hire of the negroes for the previous year, whether the same had been paid or not; and he has presented a number of these unpaid notes taken for hire previous to 1st January, 1863, and claimed credit for them ; this claim has also been allowed, as will appear in "*the concluding statement.*" A list of the notes so allowed, with a calculation of the balance of principal and interest due thereon up to 1st of July, 1867, are set forth in Exhibit B of this report.

During the year 1864 and first part of 1865, the estate has barely paid expenses, and this portion of the account being altogether in Confederate currency, has been made up separately. In 1864 the expenditures exceeded the receipts by $3,038.30, but of the $15,260.72 paid out this year, over $10,000 was paid in December. In 1865 the receipts of Confederate currency exceeded the payments, but was not quite sufficient to refund to the administrator the balance of $3,038.30 due him in 1864. Of the payments in 1865, however, the sum of $1,960.75, is receipted for in December, 1865, long after this currency was worthless. I suppose that it was not paid at all, although receipts were given. Deducting therefrom this sum of $1,960.75 from the payments of 1865, the receipts in this year would be more than sufficient to reimburse the balance in his favor in 1864, and even after allowing these credits there remained a balance of $985.86 of Confederate currency due the administrator on the account of 1864 and 1865. Regarding this balance, whether in favor of the estate or administrator, as worthless, I have not carried it forward into the general result. The negroes and the plantations have simply supported themselves and the family of testator during that time.

In May, 1865, after the surrender of the Southern armies, a new currency is introduced, and a new account is opened. From that time till 1st of July, 1867, I find a balance of seventeen hundred and twenty-five dollars and ninety-four cents against the complainant, which is added to the balance of principal and interest brought forward from 1863, as appears in "*the concluding statement.*"

In this accounting the charges against the administrator are identical with the charges contained in the returns to the Ordinary, with one single exception. The sum of $863 of the 17th March, 1856, seems to have been omitted by some oversight, and has been

inserted in the account herewith reported. The only credits claimed by the complainant and rejected by the Commissioners, are as follows:

First. All expenses of the family of the testator incurred and paid since the 27th of September, 1865.

Second. Three receipts of Wm. A. Lewis, dated January 7th, 1856, for $278.45 in lieu of a receipt of 23d January, 1856, for $103.42.

Third. Receipt of W. W. Edge, of 17th of March, 1858, for $600, for overseer's wages in 1858.

Fourth. Four thousand dollars invested in 7 per cent. Confederate bonds in 1863.

On the 27th of September, 1865, the institution of slavery in this State was abolished by a solemn Ordinance of a Convention of the people. That result, which had been anticipated by our people, and was, in fact, a foregone conclusion from the termination of the war, made the estate of Richard E. Kennedy insolvent beyond all contingency. The administrator had been in the possession of the estate ten years, and must be presumed to have known the nature and value of the assets exclusive of the slaves, as well as the indebtedness of the estate of his testator, and cannot now plead a want of notice of the emancipation, or want of knowledge of the condition in which the estate was left by that act. His payment, therefore, of expenses incurred for the support and education of the family since 27th of September, 1865, was from a fund that he knew or ought to have known belonged to the creditors of his testators. These payments amounted in the aggregate to $727.38.

The three receipts dated 7th of January, 1856, amounting to $278.45, are endorsed upon a long statement of accounts between the creditor and testator for services rendered for making collections of debts due to the testator individually, and to a partnership or two, of which he was a member. One called Kennedy & Hutchinson, and another Kennedy, Hutchinson & Co. In these amounts was one charge of one hundred dollars for a mistake, and some other items that might have been considered objectionable. On the 23d of the same month, Lewis gave another receipt to the administrator for $103.42, "it being balance due for settlement of the business of R. E. Kennedy and Kennedy & Hutchinson, as appears by the receipts on these settlements." The administrator, in his returns, only claimed credit for $103.42, and that sum has been allowed by the Commissioner and the other rejected. The fact that the complainant

claimed credit for $103.42 only in his returns to the Ordinary, while this transaction was comparatively fresh in his memory, and that he has offered no satisfactory explanation of the existence of the two receipts, are sufficient to satisfy the mind of the Commissioner that the sum of $103.42, which has been allowed, was the sum actually paid by the administrator on the final adjustment of the claim.

With regard to the payment to W. W. Edge, the complainant makes this statement: That he had employed Edge to oversee the Reed place in 1858 and put him in possession; that, subsequently, he made an advantageous sale of this land to Dr. Wm. P. Thompson, upon condition that he was put into immediate possession of the premises, and that Edge refused to leave the land till his salary was paid. In order, therefore, to secure the sale of the land to Dr. Thompson, complainant paid Edge his salary.

This payment to Edge was certainly a purchase of his services for the whole of 1858. It does not appear, however, that he performed any service for the estate. It does not appear that the administrator endeavored to make use of Edge and failed. The salary was a large one. No overseer before Edge had been paid more than $350, and that was paid always at the end of the year.

The administrator states that Edge and the other overseers were supplied with some portion, or all of their provisions, a milch cow, &c., in addition to their regular salary. But all these facts do not satisfactorily account for the payment of so large a salary so early in the year for services that were not rendered; and no excuse or explanation given for the failure to make some profit from his services.

Inasmuch as Edge was already on the land, and the year had begun before the delivery was made to Dr. Thompson, and there was difficulty at that late date to get another new home, I think the complainant ought to have some benefit for the payment made, but to what amount, I cannot, in the absence of evidence, satisfactorily determine. Under all the circumstances brought to the notice of the Commissioner, the complainant may be allowed credit, without any great injustice, for the sum of $350, the salary paid to the other overseers.

This sum, with interest and commissions, has been deducted from the general balance due from the administrator, as will be seen in "the concluding statement."

The investment of $4,000 in Confederate 7 per cent. bonds was

30

not allowed for several reasons.   In the first place the administrator does not appear from his accounts to have used that diligence in applying the funds in his hands, to the payment of the debts of his testator, as it was his duty to have done.   On the 1st of January, 1861, there was a balance of $6,238.75 in his hands; on the 1st of January, 1862, $9,267.64, and on 1st of January, 1863, $14,370.82; and yet in the year 1860, he paid only $2,973.59 of the debts of his testator; and in 1861, only $100, and in 1862, $270.89.  During all this time there were large debts of the deceased, outstanding.  It was his duty to apply the money in satisfaction of these obligations as fast as it came into his hands, and if loss has been occasioned by reason of his neglect of a plain duty, it should fall upon the administrator.   It is stated, however, that the balance on hand of the administrator were made up by charging himself annually with the hire of the slaves for the year previous, when in fact none or but a small amount had been actually collected.

No proof has been made on this point beyond what appears in reference to payment of the hire of negroes for 1860 and 1861, and M. S. Harden and L. C. Hinton both say this payment was made in 1862.   But it has been conceded by defendant's solicitors that Harden made this payment in March, 1863, and that it amounted to $6,000.   It seems that Mr. Hinton was doubtful as to the propriety of receiving this money from Harden, and consulted with Mr. Hemphill, who was his legal adviser and a large creditor of the testator, as to what he should do.   Mr. Hemphill advised him to accept the money from Harden and invest it.   The reply to this advice that prudence would have dictated, would have been, that he, as administrator, would receive it from Harden, and if Mr. Hemphill would accept it in part payment of his claim, and if he would not accept it, this would have furnished a good excuse for not accepting the money from Mr. Harden.   From the testimony of both Mr. Hemphill and Harden, I should infer that Hemphill would have taken the money if it had been pressed upon him.   And it would not have been consistent in him to refuse to receive that currency in payment of debts due to him, which he advised Mr. Hinton to receive.   There is no evidence that Mr. Hinton pressed this money on Mr. Hemphill, but if there was, and Hemphill had refused to receive it, there were other creditors for large sums, to whom he might, but does not appear he did offer to pay it.   That he might have paid it to some of the creditors we may fairly con-

clude, when he did pay out, in 1863, the sum of $4,331.22, on the debts of testator.

The defendant's Solicitor has objected to the allowance of the greater part of the credits claimed by the complainant. The objections were of three kinds :

First. Several claims paid after they were barred by the statute of limitations, were objected to as improperly paid.

Second. The payment of $2,397.42, on the 28th of March, 1856, to Maj. John Kennedy, on sealed note, was objected to because that note was not a debt, but simply evidence of so much money advanced by Maj. John Kennedy, the father of the testator, to his son.

Third. It is contended that the Act of 1789, prescribing the order for the payment of debts of deceased persons, is mandatory ; that an executor or administrator cannot depart from it, under any circumstance, but at his peril ; that the total amount of money that has passed through complainant's hands as administrator, was sufficient to have discharged in full all the debts in the first, second, third and fourth classes, and also to have satisfied in full or in greater part, all debts of the 5th class ; that in paying debts of the 6th class, or simple contract debts, in paying the current expenses of the family of the testator, and for repairs upon the dwelling, while debts of the 5th class, or bonds were still unsatisfied, was a *devastavit* on the part of the complainant, and that he and his sureties are now liable to pay all the outstanding debts in full, or *pro tanto* as would have been applicable to them if the complainant had complied with the strict rules of the law.

The defendant's Solicitors, therefore, while admitting the evidence of the payment of the debts of testator, by promissory notes or open accounts, and of the current expenses of the family, and for repairs upon the dwelling by the administrator, as satisfactory, contend that they have been improperly paid, and that he is to have no benefit from them unless the assets shall be more than sufficient to discharge the debts of a higher grade.

As to the first objection, the Commissioner rules that it is not the imperative duty of an executor or administrator to plead the statute of limitations, and that if he be satisfied that the debt is *bona fide* and not paid, he may lawfully waive the protection offered by the statutes and pay the debt; more especially may he do this, when the testator, as in this case, has directed all *just debts to be paid.*

The Commissioner has allowed the administrator credit for $2,397.42 paid Maj. Kennedy, on the 28th of March, 1856, which is the subject of defendant's second objection. When an administrator is ordered to account for his administration, he is entitled to credit for only so much money as he proves that he has paid for the estate. It was his duty to examine every claim presented against the estate he represents, and be convinced that each is an actual *bona fide* debt unpaid, before he liquidates it. The presumption of law would be that he has done his duty, unless the contrary is made to appear. Before he can be made to respond for moneys improperly paid, it should be shown, not only that the debt paid was not the debt of the deceased, but that the administrator knew it was not, and colluded with the pretended creditor in defrauding the estate; or that the claim was so unreasonable or suspicious, from the manner of its execution, or from other circumstances, as to put the administrator, if an honest man and faithful trustee, upon such inquiry as would have discovered the falseness of the claim.

The evidence offered is not such as by excluding all other conclusions, demonstrates that this was not the debt of the testator. The testimony of the testator, (obtained, reduced to writing, and published in another case during his lifetime, and offered here under objections of complainant's solicitors,) did state that he at one time put into his father's book a note for $1,000, for money advanced by his father, which he says was the only note he ever knew of his father having for money advanced by him to his children.

The testimony of several witnesses was offered on the same subject, but all more vague than that of the testator. And if the evidence had demonstrated that the note alluded to, was the identical note referred to by the testator, as given for money advanced, we might infer from the fact that testator knew that this note was in his father's possession, and that he might some day be made to pay it; that he intended to pay it, and by these acts betrayed the purpose to waive the gift his father intended for him. But leaving these considerations out of view, there is no question but that the signature to the note was genuine; that upon its face it appears to be a *bona fide* subsisting legal demand. There was no proof impeaching the integrity of the complainant in this transaction. Maj. Kennedy was a very old man at the date of this settlement. The administrator was his son-in-law and a brother-in-law of the testator. John Kennedy, Jr., a brother of testator, and possibly Mrs.

Coleman, his sister, all participated in this settlement, and all are, or were, persons of integrity. I cannot believe that one, much less all, of these relatives of the testator, would have colluded to defraud the widow and minor children of their deceased brother, upon whose grave the clay still lay fresh.

The third objection or point made by defendant's solicitors is the chief one in the accounting, both on account of its novelty, the magnitude of the sum of money in this case dependent upon its decision, as well as tending to settle the rule by which all persons shall account who have been so unfortunate as to hold offices of trust during the war.

The assets of the estate are manifestly insufficient to discharge the debts that have been presented and established. Under ordinary circumstances, when the estate of the deceased is insolvent at his death, the administrator would at his peril proceed to pay the debts out of their prescribed order. But if the terms of the statute are mandatory, he would depart from this prescribed order, in all cases, at his own risk. Even if the assets were far more than sufficient to discharge all debts of all grades, and the representative had applied some portion of the assets to the extinguishment of debts by simple contract because they were more urgent, he could not excuse himself from the payment of debts of a higher grade, by showing that there was an abundance of assets on hand that had been destroyed by the *vis major*, and without his fault. If this be the law, executors or administrators could proceed safely only by distributing every sum, however insignificant, *pro rata* among all creditors of the highest grade at the time, however numerous, and by cutting off the family or beneficiaries of the deceased from participating in the enjoyments of any portion of the income, leave them to starve, with, possibly, an immense fortune in view. Such a rule would be impracticable, unreasonable and unjust. The great rule of law, applicable to trustees in every capacity, is " due diligence and good faith," such as any prudent and honest man would exercise in the management of his own estate; and if an executor or administrator, in the exercise of due diligence and acting in good faith, looking to the best interest of the estate, depart from the order of payment of debts prescribed by the statute, and assets of the estate, sufficient at that time to discharge all debts, are afterwards lost or destroyed by *vis major*, I do not think he can or ought to be held responsible.

Evidence has been introduced to show that the estate was known

to be involved very largely in debt; that the testator was surety to Thomas DeGraffenreid for a very large sum; that DeGraffenreid was insolvent, and known to be so, and that, therefore, the adminis- trator, in this instance, has not exercised that diligence due from him, inasmuch as he had not sold the slaves long before the war, and applied the proceeds to the extinguishment of these claims. It is unnecessary to discuss the question of what might have been the liability of the complainant, in case it had been conclusively shown that Thomas DeGraffenreid was insolvent before the war. The testimony of C. D. Melton, who was the attorney of Thomas De- Graffenreid, and well acquainted with his affairs; the testimony of Messrs. Hemphill & McLure, both lawyers and intelligent business men, and that of Mr. Agurs, a shrewd and watchful merchant, is enough to settle the question of DeGraffenreid's solvency up to the date of the decree of *De Graffenreid* vs. *De Graffenreid*. For the payment of this large decree, Thomas DeGraffenreid was respon- sible before the testator, and he was possessed of a very large estate, ample, in the opinion of Mr. Melton, to discharge all his debts, including the decree. The complainant was also a party to that suit, and, through his solicitor, co-operated with and materially assisted the complainant, T. H. DeGraffenreid, in securing a decree during the war, when our Judges, as a general rule, refused to hear litigated cases. I think, therefore, the defendant has failed to show a want of proper diligence on the part of the complainant, in reference to the DeGraffenreid claim, beyond the point ruled in considering the propriety of investments in seven per cent. Confederate bonds.

If we leave this large DeGraffenreid debt out of view, the estate of testator, before emancipation of the slaves, was sufficient to pay all debts, and there would still remain a handsome estate for distribution among his children. If these conclusions be correct, there are no evidences of bad faith on the part of the administrator in paying debts by simple contract before debts by bond, and in allowing the family of the testator to have the benefit of the income of the *corpus* of the estate, as well as in furnishing the necessary funds to pay for the repairs on the house.

For these reasons the Commissioner has allowed the complainant the benefit of all payments made on account of the debts of the testator, or for support and education of his family, up to the 27th of September, 1865, and also for repairs of the dwelling.

The following statements made from calculations not claimed to be precisely, but only approximatively correct, may be useful in

showing what amount of money was received by the administrator up to 1st of January, 1864, from what sources received and how it was applied :

### RECEIVED.

| | | |
|---|---|---|
| From sales of property............................. | | $42,478 25 |
| From income, (crop, hire, interest,)............. | | 33,223 61 |
| From collection of notes and accounts........ | | 38,413 10 |
| | | $131,114 96 |

### PAID.

| | | |
|---|---|---|
| For widow's dower, horses, mules, &c. ...... | $4,584 58 | |
| For repairs on house.............................. | 3,081 68 | |
| Administrator's commissions..................... | 6,272 75 | |
| Debts of testator.............................. .... | 83,098 81 | $97,007 82 |
| Total payments of family.........................$97,007 82 | | $37,107 14 |

From this sum ($37,107 14) deduct balance against administrator, 1st of January, 1864................................. ............... 11,513 39

And there is left.................................... $25,693 55

which seems to have been expended for the benefit of the family. This sum is about $8,000 less than the income up to 1st of January, 1867.

The plaintiff excepted to the report on the following grounds, viz :

1. Because the Commissioner disallowed to its full amount the payment of $600 to Warren Edge, in March, 1858, when it appeared that the said payment was made in good faith, and for the benefit of the estate, and in the absence of all proof to the contrary, it should have been allowed.

2. Because in his mode of charging and carrying forward interest on the annual balances, the Commissioner has in effect compounded the interest against the administrator.

3. Because the Commissioner, whilst in every instance charging interest against the administrator, on annual balances, when against him, has not allowed him interest on the annual balances in his favor.

4. Because the principle of charging interest on the annual balances, is not properly applicable to cases of administration during the earlier years of the same, when the funds are necessarily retained in hand to meet the demands of creditors.

5. Because the Commissioner erred in reporting large cash balances against the administrator in 1861 and 1862, when it appears from his accounts, and from the testimony in the case, that said apparent balances arose from the fact that, in his return to the Ordinary, the administrator has charged himself annually with the gross amount of the hire of the negroes belonging to the estate, whether the same had actually been collected or not; whereas, the hire of the negroes, for the years 1860 and 1861, amounting to $6,000, was not paid to the administrator until March, 1863.

6. Because the Commissioner erred in making a rest in the accounts of the administrator, at January, 1863, and reporting the balance then apparently in the hands of the administrator, as so much cash to be charged against him, absolutely and unconditionally, and not subject to be reduced by subsequent disbursements or balances, in favor of the administrator; whereas, it is submitted, the accounts should have been carried regularly forward, allowing the administrator the benefit of all subsequent disbursements and investments.

7. Because if this mode of stating the accounts be correct, the balance reported 1st January, 1863, should be reduced by the whole amount of notes for negro hire, then uncollected, and particularly by the sum of $6,000 paid by M. S. Hardin, for negro hire in March, 1863, due for the years 1860 and 1861.

8. Because the balance 1st of January, 1863, was a balance in Confederate money, and should have been carried forward regularly with the accounts of subsequent years.

9. Because the investment of $4,000 in 1863, in Confederate money, was authorized by law; was made in good faith, of funds which could not have been applied to the debts of the estate, and the administrator should have been allowed credit for the same.

10. Because the administrator should have been allowed credit for the payments made by him since September, 1865, for the support and education of testator's family, out of the income and rent of that portion of the estate specifically bequeathed and devised by testator for that purpose; for the reason that the devises and bequests of the will in favor of the family was assented to by the administrator when the estate was solvent, and the right to the income thereof was not subject to the control or direction of the administrator, but the said income was a trust fund in his hand for that specific purpose.

Some of the defendants also excepted to the report on the grounds :

1. For that the Commissioner has allowed various amounts of credit to the complainant, amounting in the aggregate to $16,775 for the payment of simple contract liabilities, whilst a large amount of testator's own liabilities by specialty remain unpaid, for which his sureties are liable.

2. Because the Commissioner has erred in allowing complainant —— thousand dollars for so much money expended upon the dwelling house of the testator without proof that so much was required to make the necessary repairs on said dwelling.

3. For that the said Commissioner erred in allowing credits to the complainant on account of the widow and children of testator, over and above the provision of his testator, for their maintenance and support.

4. For that the Commissioner has erred in allowing complainant credit for the sum of $2,397.45 for so much money paid by him to Major J. Kennedy on a paper, purporting to be a sealed note for $1,000, dated April 10, 1836, when by the proof it is clear that said paper was given to the said Major K. by testator, his son, as evidence of an advancement made by him, the said Major K., to the said testator. And whereas, even if the said note had been a *bona fide* obligation, the law presumed it to have been paid, from the lapse of time and attendant circumstances.

5. For that the Commissioner erred in allowing complainant credit for the sum of $300, for so much money paid to William M. McDonald, when there was no proof that any such debt ever subsisted.

6. For that the Commissioner erred in holding that an administrator was not bound to plead the Statute of Limitations.

7. For that the Commissioner erred in holding that the Act of 1789, as to payment of debts, was directory and not mandatory.

8. For that the Commissioner erred in allowing to the complainant a credit of $350, paid to W. W. Edge, for services never rendered.

9. For that whereas the testator, by his last will and testament, directed that all debts due to him should at once be collected and applied to the payment of debts, and that any deficiency should be made up by sales of property; and whereas, the administrator neglected, for several years, to make such sales and extinguish said debts, he should be made responsible for the same, so far as assets

came into his hands, which have since been lost by the casualties of war or otherwise.

CARROLL, Ch. Numerous exceptions have been taken to the Commissioner's report, ten by the plaintiff, the administrator, and nine by'the defendants, the specialty creditors of Richard E. Kennedy, deceased. The former will be first considered.

For the payment of $600 to Warren Edge, the plaintiff has been allowed a credit of $350 only. The amount of the credit is objected to on both sides, the administrator contending that it is too little, and the creditors that it is too much. The ruling of the Commissioner seems to be well sustained by the decisions in *Davis* vs. *Whitridge,* 2 Strob., 241, and *Atkinson* vs. *Fraser,* 5 Rich., 519.

It has not been shown that the administrator is charged with more than simple interest upon the annual balances against him, and the Commissioner seems to be correct in his conclusion that the plaintiff's second exception is founded in mistake.

Interest is allowed upon the balance for the year of 1857, in favor of the plaintiff, the Commissioner having modified his original report in that regard, without objection on the part of the creditors. The balance in the plaintiff's favor, for 1863, is deducted from the balance against him for 1862. As to the Commissioner's omission to compute the interest on the apparent balances in favor of the plaintiff, on the 1st of January in the years 1865 and 1866, respectively, the explanation submitted in the report upon the exceptions, is regarded, upon the whole, as not unsatisfactory. The plaintiff's pecuniary transactions in 1864 were, of course, altogether in the currency of the late Confederate States.

The balance in his favor of $3,038.30, which they exhibit, arose out of some $10,000 paid during the month of December, 1864, when that currency was almost valueless. If the feigned payment in December, 1865, of $1,960.75, in Confederate Treasury notes, be struck out of the account, the receipt of 1865 would more than repay that balance. Substantial justice seems to have been accorded to the plaintiff in the several matters complained of in his third, sixth and seventh exception.

The rule of computing interest upon the annual balances has been long and firmly established. No authority has been cited, nor any sufficient ground suggested, to warrant the modification of the rule proposed by the plaintiff's fourth exception.

The sums due for the hire of the negroes in 1859 and 1860, the

plaintiff, in his returns to the Ordinary, sets down as having been received, respectively, on 1st of January, 1860, and 1st of January, 1861. It is conceded, as we are informed by the report, that $6,000 of the sums referred to were, in point of fact, never paid to the plaintiff until March, 1863. Yet, in his statement of the accounts, the Commissioner has charged the plaintiff with the receipt of those sums, as of the dates set down in his return. It is not perceived why the plaintiff should be charged with having received the $6,000 referred to at a date earlier than that of its actual receipt. He certainly was not estopped, by his returns to the Ordinary, from showing when, in point of fact, the fund really came into his hands. Whether the moneys of his testator's estate were properly administered, or were allowed to remain idle and unproductive, or were otherwise misapplied, seem to be matters wholly irrelevant in determining the date at which that fund should be treated as having been received by the plaintiff.

The balance of $14,370.82, reported as against the plaintiff on 1st of January, 1863, does not consist wholly of receipts prior to 1st of January, 1862. On the contrary, it comprises moneys to the amount of $3,484.77 not received by the plaintiff until the 3d of November, 1862, and also six thousand dollars due for hire of the negroes in 1860 and 1861, which, as we have seen, was, in fact, never paid to him until March, 1863. In regard to those receipts it is considered that the plaintiff is entitled to such abatement as may be authorized by the Ordinance of September, 1865; and to that extent the plaintiff's eighth exception is held to be well founded.

Of the $6,000 dollars received by the plaintiff in March, 1863, he invested four thousand dollars in the bonds of the late Confederate States of America. The Commissioner has rejected the credit claimed for this investment. It is manifest that prior to the plaintiff's receipt of the $6,000, the moneys actually in his hands were insufficient for the payment of his testator's debts. It was plainly his duty to provide the funds necessary for that purpose. It was proper, therefore, if practicable, to collect the $6,000 due for hire of negroes. But payment could only be obtained in Confederate Treasury notes. It is in proof that, in the District of Chester, " Confederate money, in 1862, was current with every one." In 1863, "some large debts to the Bank of Chester were paid in that currency." It was received in that year by the teller of that bank in payment of a sum of money due to him by the plaintiff as ad-

ministrator. On the 12th of March, 1863, it was accepted by a gentleman, resident in Chester and a member of the legal profession, in payment of a debt due to himself as trustee. The Sheriff of that District received that "money till 1864, when not notified by the plaintiffs in execution not to receive it." It appears, therefore, that in receiving that currency in March, 1863, the plaintiff only acted as many other persons in that community seem to have done.

The Commissioner infers from the testimony of Mr. Hemphill that he would have taken this money if it had been *pressed* upon him. It may well be questioned whether any amount of pressure would have sufficed, when the testimony of the plaintiff is borne in mind "that in 1862 and 1863, he offered to pay Hemphill; that he frequently offered to pay him, but he declined to take Confederate money." This evidence is confirmed by Hemphill himself, who testified that the plaintiff did offer, in 1863, to pay in "money or notes, and that witness then declined the offer; and that if the money had been offered by Mr. Hinton, in 1862, witness thinks he would have received a *part* of it." No proffer of this sum of money to Hemphill could have been made by the plaintiff in 1862, for it never came into his hands, as has been stated, until March, 1863.

It is stated in the report that in the course of the year 1863, the plaintiff paid debts of his testator to the amount of $4,331.22. This very fact goes to vindicate the plaintiff's receipt of the $6,000 referred to in Confederate treasury notes.

He deposes that he was advised by his legal counsel, Mr. Hemphill, to receive payment of the debt in that currency; that it was best to receive and invest it, and the latter in his testimony has not denied or impugned the statement. It does not appear that any censure or blame can justly be imputed to the plaintiff for accepting payment of the $6,000 in Confederate treasury notes. The fund being now in his hands, how was it to be disposed of? All of his testator's proper debts were paid by the plaintiff, except those due to Hemphill, who was unwilling to receive that currency. There is no sufficient proof that the plaintiff could have made any better disposition of the $4,000, which remained unexpended, than was done, when he converted it into treasury bonds of the late Confederate States. In doing so, he was not placing the funds beyond his control. It was intended to be an investment, and so to remain subject to be re-converted into like money, if demanded by the exigencies of the estate. No wilful misconduct is imputed to him, and to hold

him responsible for the loss which has resulted from the investment in question, would be to enforce a harsher rule of accountability, than there is recognized in this jurisdiction. "The Court," it is said, "is extremely liberal in making every possible allowance, and cautious not to hold executors or administrators liable on slight grounds."—2 Williams on Executors, 1630, *Haile* vs. *Shannon*, Mss., 1866. It is considered that there is good and substantial grounds for the plaintiff's ninth exception.

As to the concluding exception, on the part of the plaintiff, (the 10th,) the judgment of the Commissioner is entirely approved.

The exception exhibited by the specialty creditors remains to be considered.

It is in proof that, at his death, the testator's dwelling was in bad condition; the roof leaky and the back piazza decayed; that the dining room built was necessary to the comfortable enjoyment of the dwelling, and that "the improvements made added as much to the value of the property as they cost." It has not been shown that the credit allowed the plaintiff, upon this account, exceeded the actual costs of the improvements and repairs. It cannot be safely affirmed, that the judgment of the Commissioner, overruling the second exception taken by the creditors, is unwarranted by the evidence.

The obligation, or single bill mentioned in the fourth exception on the part of the creditors, was certainly of a very ancient date, when paid by the plaintiff. It may have been intended originally to serve as the mere evidence of an "advancement" from Major John Kennedy, to his son, the plaintiff's testator. But the deposition of the testator, Richard E. Kennedy, which was produced before the Commissioner, is not regarded as competent evidence to disprove the debt. A similar demand was set up by Maj. Kennedy against the representative of another of his deceased sons, Henry Kennedy, and as it seems, was admitted as a set off against his purchases from the administrator. There was proof also of certain declarations by Major Kennedy, to the effect that he had "let his son-in-law, Coleman, have money, and had taken his note for it; that he did not expect Coleman to pay, but if Coleman did not do right in the matter of Henry Kennedy's estate, he, (Major K.) had it in his power, and should make Coleman pay it." The plaintiff deposes that the payment was made by him in good faith, and that he "did not suspect that there was anything wrong" about the claims.

I am not satisfied that the Commissioner has erred in his conclusion as to the payment.

The demand of Wm. M. McDonald is founded upon a promissory note. The original note was not produced, nor its absence accounted for before the Commissioner, nor was the attention of the Court directed to any secondary evidence of its contents. The fifth exception on the part of the creditors must of course prevail. Their sixth exception must also be sustained. It does not point out, as it should have done, the particular credits, to which it applies, neither does the report indicate them. It only states vaguely that " several claims paid after they were barred by the Statute of Limitations, were objected to as improperly paid." The objection was overruled, the Commissioner holding that an executor or administrator, acting in good faith, might waive that defence. It is sufficient to say that it was otherwise adjudged in *Bird* vs. *House*, Sp. Eq., 255.

What has already been said in commenting upon the plaintiff's first exception, disposes of the 8th exception taken by the creditors.

The remaining exceptions on part of the latter may be considered together.

At his death the testator, R. E. Kennedy, owed debts of his own to a large amount, and he and Thomas DeGraffenreid were the sureties of Mrs. Sarah DeGraffenreid upon her bond as Committee of her lunatic son. But Thomas DeGraffenreid executed to him a bond of indemnity, and had thus the primary liability of such suretyship.

The testator directs his debts to be paid as soon as possible, out of the proceeds of his notes and accounts, and should they prove insufficient, the deficiency to be supplied by " moneys arising from sales of property." Not doubting that after the payment of all the debts, there would still remain a large estate, the plaintiff proceeded accordingly in his administration, paying the simple contract debts to a very considerable amount; leaving unpaid the less urgent specialty creditors; and expending moneys for repairing and improvements upon the testator's dwelling, and for the personal expenses and household supplies of his widow and children. The negro slaves of the testator have been subsequently emancipated, and the unfortunate issue of the recent war, with its disastrous consequences, have brought insolvency both upon Thos. DeGraffenreid and the estate of the testator, R. E. Kennedy.

It is urged by the specialty creditors of the latter, that the plaintiff ought to have sold his testator's slaves long previously

to their emancipation, and out of the proceeds should have paid the debts, he being fully aware of their existence, and having failed to do so, that he should now be held accountable for their value; that in making advances for the use of the testator's family, and in paying his debts by simple contract, while his specialty debts were left unpaid, the plaintiff plainly departed from the order of payment, and the course of administration prescribed by law, and that in any event he should be liable to the extent of the assets thus misapplied. The estate of the testator, R. E. Kennedy, was of very considerable value, his negroes, slaves, at his death being one hundred and thirty-five in number. " If," says the report, " we leave this large DeGraffenreid debt out of view, the estate of the testator, before the emancipation of the slaves, was sufficient to pay all debts, and there would still remain a handsome estate for distribution among the children."

The liability of the estate as surety for Mrs. DeGraffenreid was contingent, and the amount of such liability was not ascertained until by the decree of the Court, in the suit against Thos. DeGraffenreid, referred to in the report. The sum decreed against him in that cause seems to have been greatly more than was anticipated by the parties interested. It is in evidence that DeGraffenreid was reported to be a man of wealth, was owner of some 200 slaves, and of a large plantation in Chester District. An intelligent witness testifies that he " was attorney and adviser of Thomas DeGraffenreid from 1857 to 1863; was in possession of his papers; had no doubt of his solvency during that period; his good assets, over and above his lands and negroes, amounting to $75,000 at least; thought him good even after the decree against him," which has been referred to. No wilful misconduct in his administration has been imputed to the plaintiff. It was under the advice of legal counsel that he paid the testator's simple contract debts, and made advances of money for the repairs and improvements of his dwelling and for the personal and household expenses of his family. The Act of 1789 prescribing the order in which debts are to be paid " says the Court is merely directory to the executor, and intended for his security and protection in the event of the insolvency of the estate. He may, if he thinks proper, first pay the debts of an inferior grade, and the only consequence is that, in the event of a deficiency of assets, he is liable, personally, to the extent of the assets for the preferred debts."—*Huger* vs. *Dawson*, 3 Rich. Eq., 330.

Where there is a sufficiency of assets, executors may pay debts by simple contract before specialty debts, if not objected to by the specialty creditors.—2 Wms. Ex'ors, 1536. When, therefore, an executor, acting in good faith, and having good grounds for believing the assets to be ample, pays debts by simple contract before the specialty debts are paid, but without objection on their part, he commits no breach of trust—no violation of duty. To adhere to the prescribed order of payment, with rigorous and inflexible exactitude, would be attended with infinite inconvenience and mischief. The consequences that would result are well set forth in the report. "If this be the law, an executor or administrator could proceed safely only by distributing every sum, however insignificant, *pro rata* among all creditors of the highest grade at the time, however numerous; and by cutting .off the family or beneficiaries of the .deceased, from participating.in the enjoyment of any portion of the income, thereby leaving them to starve, with probably an immense fortune in view." From regard to such considerations, when a clear surplus is admitted, and all the parties competent to consent have consented, the Court has ordered payment in part of a legacy, before the creditors have been paid.—Roper on Leg., 7 ; *Pearce vs. Baron*, 12 Ves., 459. In the case referred to, the Court itself had assumed the administration of the estate, and there were infants concerned, who were, of course, incapable of consenting to the order passed. In the will of the testator, Kennedy, there are various provisions and directions computing that the great bulk, at least, of his negro slaves were *not* intended to be sold. He bequeaths to his widow "such house servants as she may need," and authorized her to select "for the plantation devised to her, such negroes as she may prefer to work the same;" his other negroes he gives to his wife and children, "to be equally divided among them, share and share alike." He directs his young negroes to be kept on one of his plantations, and empowers his executor to "hire out all his negroes not expressly excepted," and " to sell any of them that are turbulent or otherwise troublesome."

The decree against DeGraffenreid seems to have been made in 1863. The inference is that the sum payable under the decree was not ascertained until the coming in of the report upon the accounts of Mrs. DeGraffenreid as Committee, and its confirmation at the next succeeding sitting of the Court in July, 1863. In view of all the circumstances mentioned, the plaintiff, prior to the decree in 1862, cannot justly be charged with want of ordinary prudence and

circumspection, in having forborne to sell the slaves of his testator in order to pay a contested debt, the amount of which was wholly unascertained, and for which the primary liability rested upon Thomas DeGraffenreid, then possessed of a large estate, and the amplest pecuniary resources.

After the decree had been pronounced, and the indebtedness under it ascertained, the proof is that Thomas DeGraffenreid still continued solvent, and, it is to be inferred, so remained until the close of the recent war. The amount decreed was large, some $70,000, and its payment by the plaintiff would have absorbed probably the entire estate of his testator. It is further to be remarked that in 1863 the Confederate Treasury notes, then the sole currency of the country, were greatly depreciated in value, and were becoming more so every day. It may well be doubted, upon the proof adduced, whether the persons entitled to the moneys payable under that decree would, after July, 1863, have consented to accept payment, in that currency, of so large a sum.

The insolvency of Thos. DeGraffenreid, as of the estate of the testator, Kennedy, must be attributed to the emancipation of slaves, with its direct consequences—the fearful depreciation of other forms of property and the general ruin of debtors. The principles which determine the liability of trustees, technically, in regard to trust funds in their custody, apply also to executors and administrators, in respect of assets come to their hands. If a trustee is robbed of money belonging to his beneficiary without his own default or negligence, he will not be chargeable. It cannot vary the case whether the robbery be affected by a party of highwaymen, or by a political party under forms of law. " In the course of the administration of estates," says Judge Story, " executors and administrators often pay debts and legacies, upon the entire confidence that the assets are sufficient for all purposes. It may turn out from unexpected occurrences that there is a deficiency of assets, and, if they have acted with good faith and due caution, they are clearly entitled to relief."— 1 Story Eq., § 90. It may be well doubted whether an executor would be chargeable even at law, and after judgment against him *de bonis testatoris*, for a subsequent loss of assets, without blame on his part.— *Caldwell* vs. *Micheau*, 1 Sp., 280. An unforeseen event, the consequence of a revolution in the government, is set down as ground for relief in this jurisdiction, under the head of accident.— 1 Story Eq., § 93.

But the defense of the plaintiff against the claim of the creditors

rests upon even stronger ground. The emancipation of the slaves, which has caused the deficiency of the assets, has been legalized by a formal provision in the present Constitution of the State. It was certainly no breach of trust, or duty, on the part of the plaintiff, that he failed to foresee and provide for those events. The deficiency of assets, which has resulted, was not caused by his act, but by the act of the State,—the act of the law,—and upon the principles recognized by this Court in the cases of *Hext* vs. *Porcher*, *Boggs* vs. *Adger*, and *Spear* vs. *Spear*, the plaintiff cannot be held responsible for losses, which have been thus produced.

The exceptions taken by the plaintiff, numbered five, eight and nine, and those on the part of the defendants, the specialty creditors, numbered five and six, are sustained, and all other exceptions to the report are overruled, and it is accordingly so ordered.

It is further ordered that the report be recommitted and reformed as herein above adjudged.

The plaintiff appealed from the decree on the following grounds, viz:

1. Because the payment of six hundred dollars to Warren Edge, was made by the administrator in good faith, in the exercise of a sound discretion, and he should have been allowed full credit for the same.

2. Because there is no reason, either in the law or equities of this case, requiring or justifying a rest in the accounts of the administrator to be made on the 1st of January, 1863.

3. Because the rents and profits of the real estate, devised by the testator for the support of his family, were not assets in the hands of the administrator for the payment of debts, after the administrator had assented to the devise and the same had vested in the parties beneficially interested therein, according to the terms of the devise.

The creditors of the testator also appealed, and moved this Court to reverse the decree on the following grounds, and in the following particulars:

1. Because the Chancellor erred in overruling the defendants' first exception, to wit: that the said Commissioner, by his report, had allowed various items of credit to the complainant, amounting in the aggregate to $16,775, for the payment of various simple contract liabilities, whilst a large amount of testator's own proper liabilities by specialty remain unpaid, and which, by reason of said *devastavit*, the sureties of said testator are liable to pay, the Chancellor deciding, in his said decree, that the statute of 1789 is merely directory.

2. Because the Chancellor erred in overruling the fourth exception of the defendants', which is in the following words: That the administrator had paid the sum of $3,397.43 to Major John Kennedy, on a paper purporting to be a sealed note, of $1,000, dated April 10, 1836, when, by the proof, it is clear that said paper was given to said Major John Kennedy by the testator, his son, as evidence of an advancement made by him to said testator. And whereas, even if the said note had been a *bona fide* obligation, the law presumed it to have been paid, from the lapse of time and attendant circumstances.

3. Because the Chancellor erred in not sustaining the ninth exception, to wit: That the testator, by his last will and testament, directed that all debts due to him should be at once collected and applied to the payment of his debts, and that any deficiency should be made up by sales of property; and whereas, as the administrator neglected, for nine years, to make such sales and extinguish such debts, he should be made responsible for the same, so far as assets came into his hands, which have since been lost by the casualties of war or otherwise.

4th. Because the Chancellor erred in sustaining the ninth exception of the complainant, which was in these words: "Because the investment of $4,000 in Confederate bonds, in 1863, was an investment authorized by law, and was made in good faith, of funds which could not be applied to the payment of the debts of the estate, and the administrator should have been allowed credit for the same."

The Supreme Court refused to hear the appeals until the final accounting was adjusted according to the decree. They were afterwards adjusted by a Referee appointed by the Circuit Court, and from the judgment, on his report, appeals were also taken, but it is unnecessary to state these proceedings, as the only appeals considered by the Court were those from the decree of Chancellor Carroll.

*Brice*, for plaintiff.

*McAliley & Brawley*, contra.

Aug. 13, 1872.   The opinion of the Court was delivered by

WILLARD, A. J.   Complainant's first exception presents a question of fact, whether $600 was a proper allowance to him, instead of $350, allowed by the Commissioner and approved by the Chancel-

lor, as a disbursement to an overseer employed by him upon one of the plantations under his control as administrator, *cum testamento annexo*. No question is made by the defendants as to the propriety of some allowance to the complainant, they not having excepted to that part of the decree of the Chancllor that sustains the allowance made by the Commissioner. It is, therefore, a question merely of the amount proper to be allowed.

The concurrence of the judgment of the Commissioner and of the Chancellor, as to the force and effect of the evidence, throws upon the complainant the burden of showing a clear state of facts, entitling him to the amount claimed, admitting of no reasonable doubt as to the correctness of his charge.

It is enough to say that he has not supported his demand by such clear evidence of the necessity and propriety of such disbursement, as to place the conclusions of the Commissioner and the Chancellor clearly in the wrong as to such matter of fact.

Under such circumstances this Court will not disturb their conclusions of fact. This exception should be overruled.

The second exception of complainant was abandoned on the argument of the cause.

Complainant's third exception is as follows: "Because the rents and profits of the real estate devised by the testator for the support of his family, were not assets in the hands of the administrator for the payment of debts, after the administrator had assented to the devise, and the same had vested in the parties beneficially intrusted therein according to the terms of the devise." The proposition of law stated in this exception is not considered by, nor involved in the decree, as broadly as it is here laid down. As a proposition effecting the basis of the accounting, which had already taken place before the Commissioner, the Chancellor was only bound to consider it so far as it was brought before him by exceptions to the Commissioner's report.

The only exception of the complainant to the Commissioner's report, involving the proposition, to any degree, is as follows: "Because the administrator should have been allowed credit for the payments made by him since September, 1865, for the support and education of the testator's family, out of the income and rent of that portion of the estate specifically bequeathed and devised by testator for that purpose, for the reason that the devises and bequests of the will, in favor of the family, were assented to by the administrator when the estate was solvent, and the right to the income thereof was

not subject to the control and discretion of the administrator, but the said income was a trust fund for that specific purpose."

The case does not involve any question of the effect of assenting to a specific legacy, on the subsequent powers of the administrator over assets affected thereby. Nor does it involve any question of the right of the administrator as it regards the control and disposition of the rent and income of land specifically devised. There is no trust created by the will for the maintenance of the family out of the general income of the estate, or out of any fund left in the administrator's hands. On the contrary, it would seem that the testator looked to his specific devises and bequests, contained in the third clause of the will, as a fund sufficient for that purpose, until his estate should be settled and distributed.

The question presented to this Court is simply whether the general assets of the estate could be applied to the maintenance and support of the family, after the estate had become insolvent. This proposition was correctly solved by the decree in the negative.

The first exception of the defendants, the creditors of the testator, is based on the decision of the Chancellor, to the effect, in substance, that the complainant is not liable to the specialty creditors, although the estate is insufficient to pay their demands, notwithstanding that assets have been applied by him to the payment of simple contract creditors, leaving the specialty debts unpaid, on the ground that, at the time such simple contract debts were paid, assets sufficient were reserved for the payment of the specialty debts, and although such assets have been lost by events for which the administrator is not responsible.

Apart from the relief afforded in such cases, upon the principles governing Courts of Equity, it is perhaps questionable, whether an administrator can be defended from liability to the specialty creditors, when voluntary payment is made to simple contract creditors, leaving known specialty debts unprovided for, and where such fact is charged by way of *devastavit*.

It is laid down in Bac. Abs., Executor, (L., p. 1,) as one of the instances of a *devastavit*, the payment of debts out of legal order, and the payment of legacies before creditors.

Judge Story says, (Story's Eq. Juris., § 90,) "in the course of the administration of estates, executors and administrators often pay debts and legacies upon the entire confidence that the assets are sufficient for all purposes. It may turn out, from unexpected occurrences, or from debts and claims made known at a subsequent time,

that there is a deficiency of assets. Under such circumstances, they may be entitled to no relief at law. But, in a Court of equity, if they have acted with good faith, and with due caution, they will be clearly entitled to it, upon the ground that, otherwise, they will be invariably subject to an unjust loss for what the law itself deems an accident." Again, he says: " But to found a good title to such relief, it seems indispensably necessary that there should have been no negligence or misconduct on the part of such executors or administrators in the payment of the assets; for, if there has been any negligence or misconduct, that, perhaps, may induce a Court of equity to withhold its assistance."

Our own cases leave this question open. There is the strongest reason to support the doctrine laid down by Story.

The bearing of this question on the responsibility of executors and administrators, and on the facility of administering estates, is highly important, as cases affected by it are constantly occurring. The facts of the present case illustrate its bearing in the most usual and most important form.

An administrator *cum testamento annexo* holds abundant assets to satisfy all the claims of creditors, and to fulfil the objects of the will, according to the terms of which he is bound, subject to the rights of creditors, to administer the estate. Among the claims against the estate is a contingent liability of the testator, that may or may not, according to circumstances, become a charge on the assets. In the present case the contingent liability arose out of a guardian's bond, to which the testator was surety.

The primary liability rested upon the guardian or his estate.

Even after the fact of liability has been ascertained, there yet remains the necessity of ascertaining its extent, before the assets can be applied to its extinguishment.

This amount may, as in the present case, have to be ascertained by judicial proceedings, and, even after that is done, the extent to which contribution by co-sureties can be compelled, after exhausting the remedy against the principal, may have to be ascertained by further legal proceedings. Under these circumstances, it is the duty of the administrator to hold in his hand the assets of the estate, so far as they are applicable to the payment of debts of the grade of such contingent liability, or of an inferior class, until the actual extinguishment of such contingent liability. If that is the absolute duty of the administrator, then it is of no importance how small may be the contingent liability, or how large the amount of assets.

If that is the law, the simple contract creditor must await the satisfaction of all liabilities, absolute and contingent, and the settlement of all disputed claims, before he can demand payment, however insignificant the extent of his claim, and however abundant the assets of the estate may be for all purposes of administration.

That this is not the legal notion of the rights of the simple contract creditor is obvious, from the fact that under such a state of facts he is entitled to judgment at law against the administrator in respect of the assets; the effect of which judgment is an admission of assets at the date of its recovery.—*Brown* vs. *Hellegas*, 2 Hill, 447; *Caldwell* vs. *Micheau*, 1 Sp., 6, 276; Williams on Exors., 1770, *et seq.*

As an administrator, with ample assets for all purposes, could not defeat the recovery of a judgment by a simple contract creditor by pleading merely the fact that prior demands still remain actually unsatisfied, the recovery of such a judgment would furnish no evidence of a *devastavit* by the administrator, but would operate as a legal partition of the fund satisfying the simple contract debt with part, and leaving the rest subject to the claims of prior creditors.

It may be a question whether at law the administrator could protect himself, where such partition of the assets had been made, unless resulting from a judgment, or decree, recovered without his fault, binding the assets.

What the Court of law may do, through the operation of its judgments, is it not competent for the Court of Equity to do by a simpler and less expensive process? What may be accomplished at law, but is there attended with the disadvantage of a multiplicity of suits, involving unreasonable expense and complication, may always be done, by simpler means, by a Court of Equity, providing the thing to be done is not beyond the reach of equity, or contrary to its nature. It is not to be questioned that equity will, and daily does, administer the assets of decedents' estates, by applying them to the satisfaction of debts of an inferior grade, when debts of a superior grade are in dispute or not in a condition to be discharged, and for that purpose, apportions the assets substantially as they would be apportioned under the operation of a judgment *de bonis testatoris*. It is clear, then, on fixed equitable principles, that where an administrator has already done that which the Court of Equity would have ordered done under the circumstances, it will sanction his act, and afford him protection from any evil consequences that might arise at law, from such course of action; and

it is equally clear that the qualification made by Story, that he must have acted prudently, is applicable in determining how far he is entitled to protection.

In *Swift* vs. *Miles*, (2 Rich. Eq., 147,) although sureties of an administrator were charged on the principle of a *devastavit*, on account of the payment of simple contract debts, leaving debts of a higher class unprovided for, yet the *devastavit* did not simply consist in the payment of the simple contract creditors, but in the fact that the administrator, as party to a partition suit among the distributees, allowed the realty to be distributed without making provision for the payment of the specialty creditors. Ch. Dunkin places the decision of the Appeal Court, distinctly on the ground that the administrator was charged as a party to the partition suit, with the protection of the rights of the creditors, which he wholly neglected.

The misapplication of the personal assets, by paying simple contract debts in preference to specialty debts, was not the real point at issue in that case, although Ch. Johnson, in his Circuit decree, viewed it wholly in that light, for the personal assets, thus misapplied, had been replaced out of the sales of the realty, and such restored fund applied to the specialty debts. The real misapplication on which the case turned, according to the judgment of the Appeal Court, was that which took place when the administrator suffered the proceeds of the realty to be distributed without provision made for the specialty creditors. It must be conceded that the case just noticed treated the application of the personal assets to the payment of simple contract debts, leaving the specialty debts unprovided for, as a misapplication of such assets. It must, however, be borne in mind that it was not a question in that case, whether the course pursued by the administrator in paying out assets to the simple contract creditors was justified by the condition of the estate, and the situation of the debts, respectively, at the time, but upon subsequent conduct of the administrator tending to defeat the rights of the specialty creditors. It must also be borne in mind that such an application, in derogation of the established order, by payment, is a *devastavit* in itself, unless justified by the peculiar situation of the estate at the time. It would not be a sound construction of *Swift* vs. *Miles*, to hold that it determined that, under all conditions and circumstances, the payment of simple contract creditors before specialty creditors, is a *devastavit* against which equity cannot relieve. The present question does not turn on the peculiar

wording of the statute of 1789. The principle of priority does not depend on that statute, although it established the order of priority. Reference was made in argument to an expression that occurs in *Com'r* vs. *Greenwood*, (1 Des., 450,) where it is said, "that this Act is directory to executors and administrators in the disposing of the assets of the deceased, and, therefore, if they should administer them contrary to the directions of that law, and the estate receive an injury, they might be held to answer in an action for *devastavit*." It is evident that the Court was not considering the distinction between *mandatory* and *directory* statutes, in using the expression "directory." The object of its use appears to have been to show that the Act conferred duties on the executor and administrator, for the neglect of which they would be liable, in opposition to the idea that it merely created rights of priority as among creditors, without imposing on the executor or administrator any duty in respect to such priority, for the disregard of which they could be held liable to such creditors. In order to support the right of equity to afford relief in a case like the present, it is not necessary to weaken the force of the statute by artificial construction.

It may be assumed that the duty imposed upon the executor or administrator, is indispensable, and that even the Court of Equity cannot relieve him from its performance. The question then remains, whether setting apart an ample fund for the payment of the creditors having a prior demand, under circumstances satisfying a Court of Equity as to its propriety and prudence, is not a substantial compliance with the requisitions of the statute.

That it is within the power of the Court so to do, without impairing the force and effect of the statute, appears to be without question.

Both the Commissioner and the Chancellor concur in holding that the circumstances of the estate justified the appropriation of a part of the assets to the payment of the simple contract creditors at the time such payment was made, and there is no ground to interfere with their conclusions in this respect.

The question just considered must be solved by the state of facts existing at the time the payment to the simple contract creditors was made.

The subsequent loss of assets presents a totally different question, to be solved on a different state of facts, and by the application of altogether different principles. The loss of assets will be considered under the defendants' third exception.

The second exception of defendants objects to the allowance to the administrator of a credit for payment of a sealed note of testator. It is not alleged, nor does it appear, that twenty years had elapsed from the date of the note at the time of such payment, although, if the date of the note is correctly stated in the defendants' fourth exception to the Commissioner's report, the period of twenty years must have been within a few days of expiring. As the case stands, the legal presumption of payment, arising from lapse of time, does not apply to it. It is, therefore, a question whether the administrator had reasonable ground to suppose that the note had been paid, or that it was intended by the parties as merely evidence of an advancement made by the father to his son. It was held, in *Gee* vs. *Hicks*, (Rich. Eq. Cas., 5,) in regard to the *onus probandi* in such cases, that the legal presumption is, that the debt is the debt of the deceased ; a contrary presumption can only be raised by showing fraud and collusion between the executor and administrator and the creditor ; that if the objection is in point of law, it must appear that it was not a subsisting debt ; if as to matter of fact, some suspicion of its correctness must be created by evidence. The Commissioner and Chancellor having found this issue of fact in favor of the complainant, upon evidence of a doubtful and presumptive character, this court will not disturb their conclusions.

The defendant's third exception is grounded on the proposition that the delay of the complainant in administering the estate precludes him from setting up a loss of assets by casualties of war and other inevitable causes. This proposition was denied by this Court in *Fitzsimmons* vs. *Fitzsimmons*, (1 S. C., 400,) and under that ruling the third exception should be overruled.

The defendant's fourth and last exception is based upon the refusal to charge the complainant with $4,000 invested in Confederate securities in 1863. It is not charged that this sum was a loan to the Confederate government in aid of rebellion against the United States, or even that the securities were purchased directly from the Confederate government, or its agents. It must therefore be assumed that the investment consisted in purchasing in the market obligations of the Confederate government already in circulation. It must also be held, upon the evidence and facts found, that this purchase was made with Confederate currency. It must therefore be regarded as simply converting a Confederate promise to pay a demand, without interest, into one to pay on time with interest. It is not made to appear

that this conversion prevented the administrator from availing himself of any opportunity that might present itself to dispose of the depreciated securities in his hands. Nor does it appear that the retention of the Confederate currency would have prevented the loss occasioned by the destruction of the Confederate power. The point is not distinctly made that the administrator became possessed of this Confederate currency in an improper manner. It appears that the $4,000 of Confederate money was received for the hiring of slaves. Such transactions, as well as necessary sales of perishable produce, were only practicable at that time with reference to such currency. In the absence of distinct allegations and proof, it must be assumed that this Confederate currency came legitimately into the hands of the administrator, and that the loss that occurred by the depreciation of such securities was not enhanced by the fact that the currency was changed into securities of a more permanent character. The exception should be disallowed.

No ground appears in the exceptions brought before us by the supplemental brief—taken in the course of the accounting under the decree—for interfering with the account taken under such decree. It appears that the complainant's exception proceeded upon a misapprehension of the effect of the report of the Special Referee, and as it regards the defendant's exception to such special report, they appear to have been passed upon *pro forma* by the Circuit Judge, and under the practice of this Court cannot be heard here.

The decree of the Chancellor should be in all things affirmed.

*Moses,* C. J. and *Wright,* A. J., concurred.